530 new

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**FILED**

Name  Wilder        Cornell

FEB 25 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

(Last)                    (First)

Prisoner Number  C-16564

Institutional Address  P.O. Box 8103, V-1, D-4, 1L, S.L.O. Calif 93403-8103

========================================================================

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**WHA**

CV 08 1129

Cornell Wilder
Full Name of Petitioner

Case No. ~~08        1129~~
(To be supplied by the Clerk,
United States District Court)

**(PR)**

E-filing

vs.

John Marshall

PETITION FOR A WRIT OF HABEAS CORPUS

Name of Respondent
(Warden or jailor)

========================================================================

### Read Comments Carefully Before Filling In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were **not** convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

1

## Who to Name as Respondent

You must name the person in whose actual custody you are.  This usually means the Warden or jailor.  Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced.  These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

## A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?

(a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Alameda County Superior Court   Oakland, California
(Court)                         (Location)

(b)   Case number, if known ___69342___

(c)   Date and terms of sentence __May 14, 1980__

(d)   Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.)  Yes X   No ___

Where? California Mens Colony  P.O. Box 8103, San Luis Obispo CA
(Name of Institution)                    (Address)         93409

2.    For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known.  If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second degree murder 15 years to life  Penal Code §190

3.    Did you have any of the following?

Arraignment:  Yes X   No ___   Preliminary Hearing: Yes X   No ___

Motion to Suppress:  Yes X   No ___

2

4.   How did you plead?

Guilty _____   Not Guilty ☒   Nolo Contendere _____

Any other plea (specify) _____

5.   If you went to trial, what kind of trial did you have?

Jury ☒   Judge alone _____   Judge alone on a transcript _____

6.   Did you testify at your trial?   Yes ☒   No _____

7.   Did you have an attorney at the following proceedings:

(a)   Arraignment   Yes ☒   No _____
(b)   Preliminary hearing   Yes ☒   No _____
(c)   Time of plea   Yes ☒   No _____
(d)   Trial   Yes ☒   No _____
(e)   Sentencing   Yes ☒   No _____
(f)   Appeal   Yes ☒   No _____
(g)   Other post-conviction proceeding   Yes ☒   No _____

8.   Did you appeal your conviction?   Yes ☒   No _____

(a)   If you did, to what court(s) did you appeal?

Court of Appeal   Yes ☒   No _____   _____   Denied
                                    (Year)   (Result)

Supreme Court of
California   Yes ☒   No _____   _____   Denied
                                      (Year)   (Result)

Any other court   Yes _____   No _____   _____
                                      (Year)   (Result)

(b)   If you appealed, were the grounds the same as those that you are raising in this petition?   Yes _____   No ☒

(c)   Was there an opinion?   Yes _____   No _____

(d)   Did you seek permission to file a late appeal under Rule 31(a)?   Yes _____   No ☒

If you did, give the name of the court and the result:

_____

9.   Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?   Yes ☒   No _____

3

**Note:** If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court __Northern District Court__

Type of Proceeding __Writ of Habeas Corpus__

Grounds raised (Be brief but specific):

a. __Ineffective Assistance of Counsel__

b. __Miranda Rights__

c. _____

d. _____

Result __Denied__   Date of Result __To long ago__

II. Name of Court __Ninth Circuit__

Type of Proceeding __Writ of Habeas Corpus__

Grounds raised (Be brief but specific):

a. __Ineffective Assistance of Counsel__

b. __Miranda Rights__

c. _____

d. _____

Result __Denied__   Date of Result __To long ago__

III. Name of Court __United States Supreme__

Type of Proceeding __Review by Certiorari__

Grounds raised (Be brief but specific):

a. __Ineffective Assistance of Counsel__

4

b. <u>Miranda Rights</u>

c. _____

d. _____

Result <u>Denied</u>          Date of Result <u>1984 or 1985</u>

(b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?    Yes _____    No ☒

_____
(Name and location of Court)

## B.   GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations. Attach extra paper if you need more space.  Answer the same questions for each claim.

**Note:**  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); <u>McCleskey v. Zant</u>, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: <u>Did the Board of Parole Hearings violate petitioner's Sixth Amendment as incorporated in the Fourteenth of the US. Constitution</u>

Supporting Facts: <u>The Board of Parole Hearings violated petitioner's jury trial guarantee to his constitutionally prescribed base term found in the California Code of Regulations, Title 15 § 2403 et seq., (Please See Attached)</u>

Claim Two: <u>Did the Board of Parole Hearings violate petitioners Fifth Amendment as incorporated in the Fourteenth of the US. Const.</u>

Supporting Facts: <u>The California Code of Regulations, Title 15 § 2403, channels the Board of Parole Hearings decision-making with substantive predicates and explicitly mandatory language a protected liberty interest in a base term.    (Please See Attached)</u>

Claim Three: Did the Board of Parole Hearings violate petitioner's Fourteenth Amendment right to the U.S. Constitution

Supporting Facts: The Board of Parole Hearings violates petitioner's right to the benefit of good time credits to reduce his total period of confinement, "Fixing a parole release" California Code of Regulations Title 15 §§ 2403 thru 2409

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

_____

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

In re Lee, 143 Cal. App. 4th 1400 (2006); In re Elkins, 144 Cal. App. 4th 475 (2006); Biggs v. Terhune, 334 F. 3d 910 (2003); Rosenkrantz v. Marshall, 444 F. Supp 2d 1063 (2006); Irons v. Carey 2007 WL 2027359 Cunningham v. California 2007 U.S. LEXIS 1324

Do you have an attorney for this petition?    Yes _____    No  X
If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  Feb, 18, 2008            Connell Wilson
            Date                      Signature of Petitioner

(rev. 5/96)

**(VERIFICATION – 446, 2015.5 C.C.P.)**

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

I am the party of the above entitled actions, a citizen of the United States, over the age of eighteen years and a resident of San Luis Obispo County. My current address is:

Cornell Wilder    CDC No. C-16564
California Men's Colony-West
P.O. Box 8103    Unit \    Dorm 4    Bed \ L
San Luis Obispo, California 93403-8103

I CERTIFY (OR DECLARE), UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON _____ ___ _____, 20___, AT SAN LUIS OBISPO, CALIFORNIA, 93403-8103

Cornell Wilder
PETITIONER

.......................................................................................................................................

**PROOF OF SERVICE BY MAIL**

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

I AM A RESIDENT OF SAID COUNTY, OVER THE AGE OF EIGHTEEN YEARS, AND NOT A PARTY TO THE ABOVE ENTITLED ACTION. MY STATE PRISON ADDRESS IS:

Ronald L. Backus    CDC No. K51945
California Men's Colony-West
P.O. Box 8103    Unit 1    Dorm 4    Bed 14
San Luis Obispo, California 93403-8103

ON _____, 20___, I SERVED THE WITHIN Writ of Habeas Corpus

_____

ON THE PARTY: United States District Court for the Nortern District
450 Golden Gate Ave, Box 36060, San Francisco CA 94102

IN SAID ACTION, BY PLACING A TRUE COPY THEREOF IN A SEALED ENVELOPE WITH POSTAGE THEREON PREPAID, IN THE UNITED STATES MAIL, AT CALIFORNIA MEN"S COLONY, SAN LUIS OBISPO, CA. 93403-8103, ADDRESS AS FOLLOWS:

United States District Court for the Norther District
450 Golden Gate Ave., Box 36060
San Francisco, CA 94102

_____

I DECLARE, UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON _____, 20_____, AT SAN LUIS OBISPO, CALIFORNIA

SIGNATURE OF DECLARANT

(REV. 9/02)

Prayer For Relief.

Petitioner is without remedy save by writ of habeas corpus.
WHEREFORE, petitioner prays the court:

1. Issue the writ of habeas corpus;

2. Declare the right of petitioner, as to his constitutional period
   of incarceration Penal Code § 3041(b) and found in the boards
   regulations, California Code of Regulations Title 15, Division 2,
   Article 5, § 2411;

3. Conduct an evidentiary hearing if necessary to resolve any
   factual disputed issues, and after the hearing, issue an
   order directing the board to act as set forth in paragraph
   2, above;

4. Reverse the board's finding of unsuitability to his base
   term of confinement as mandated in the regulations;

5. Restore Petitioner's entitlement to his liberty interest found
   in the base term of confinement regulations § 2403 and
   discharge Petitioner;

6. Grant any other and further relief the court deems
   proper.

Date: **Feb, 18, 2008**                    Respectfully Submitted,

                                           Cornell Wilder

                                           In Pro Per

1
2
3
4
5
6          United States District Court
7          Northern District Of California
8
9
10   In re
11   Cornell Wilder                    )    Memorandum Of Points And
12      Petitioner                     )    Authorities In Support of
13   On Habeas Corpus                  )    Petition For Writ Of Habeas
14                                     )    Corpus And Evidentiary
15                                     )        Hearing
16
17                        Introduction
18
19   1. Petitioner, Cornell Wilder, a state prison inmate appearing in pro
20   per, hereby petitions this Court for a Writ of Habeas Corpus,
21   pursuant to 28 U.S.C.§ 2254.
22   2. Petitioner claims that he is unlawfully restrained of his
23   freedom in violation of his rights under the Fifth, Sixth and
24   Fourteenth Amendments of the United States Constitution.
25
26                          Parties
27
28   3. Petitioner, Cornell Wilder, is unlawfully restrained of his

(1)

1  liberty at the California Mens Colony, in San Luis Obispo, Calif-
2  ornia by Warden John Marshall   pursuant to a judgment of
3  the Superior Court of Alameda County.

4
## Statement of Facts
5

6  4. This petition does not challenge the verdict or finding of the su-
7  perior court Penal Code §§ 190, 1168(b). However Petitioner does challe-
8  nge the parole suitability hearing held on December 6, 2005, and the
9  Board of Parole Hearings [hereinafter BPH] failure to establish a
10  parole release date. The BPH's continues to violate the mandate of
11  the Legislature to..."comply with the Judicial Council's sentencing
12  rules in setting a parole release for  Titioner sentenced un-
13  der the Uniform Determinate Sentencing Act of 1976,(Penal Code
14  § 3041 et seq..)

15  5. The BPH's repeated application to preponderance of the evid-
16  ence concerning the facts of petitioner's crime after the initial
17  parole suitability hearing violates his Due Process right to a con-
18  stitutionally prescribed base term."The base term shall be estab-
19  lished solely on the gravity of the base term",(Calif. Code Regs, tit.
20  15 §§ 2000(50), 2402 and 2403.)

21  6. Furthermore, the BPH's has violated petitioner's Sixth Amend-
22  ment jury trial guarantee that requires any fact which increases
23  petitioners"base term"beyond the proscribed regulations maxi-
24  mum must be submitted to a jury and be proven beyond a rea-
25  sonable doubt. The statutory maximum envisioned in Apprendi
26  530 U.S. 466, is the maximum base term found the BPH's may
27  impose based solely on facts reflected in the jury verdict and
28  found in the"base term" matrix, Calif. Code Regs.,tit.15,§ 2403 et

(2)

seq., In re Hogan 1986 Cal. App. LEXIS 2301, at p. 5, In re Dannenberg.
2005 Cal. LEXIS, at p. 11, the ___ ___ has violated petitioner's Sixth
Amendment right to the U.S. Constitution.

7. Petitioner ___ ___ ___ ___ ___ ___ ___ ___ ted liberty
interest, within the meaning of the Due Process Clause of the Fifth
and Fourteenth Amendments to the U.S. Constitution by placing
substantive limitations on the BPH's term setting authority.
(Calif. Code Regs, tit. 15, § 2405.)

8. The legislative mandate was a ... "release date shall be set in a
manner that will provide uniform terms for offenses of similar gra-
vity and magnitude in respect to their threat to the public.(Penal Code
§ 3041,(a) compare Calif. Code Regs., tit.15, § 2405.)

9. The BPH acts the same as the sentencing court in considering
probation, at the initial parole suitability hearing when the BPH's
considers parole at the minimum term.(Calif. Code Regs., tit. 15 § 2402
compare Cal. Rules. Ct. 11, 414.)

10. In this case the BPH's, after finding petitioner unsuitable for
his minimum term, denied petitioner the Due Process of law to
his constitutionally prescribed base term in violation of the
Fourteenth Amendment to the U.S. Constitution.

11. The BPH's continues to hold initial parole suitability hearings
under Cal. Code Regs., tit. 15, §§ 2268 and 2402, to deny petitioner's base
term Cal. Code Regs, tit. 15, § 2403 in violation of his Sixth Amendment
right to the U.S. Constitution. If, the term was established for the
crime and any adjustments resulting in a total period of confinement
Cal. Code Regs, tit. 15, § 2411, fixing a parole date, then parole hearings
would be held to determine whether a set parole date should be ad-
vance because of petitioners conduct in prison. (Cal. Code Regs, tit. 15,

(3)

1. § 2269.)

2. 12. The BPH's application of the California Code of Regulations, Title 15,
3. Article 11 et seq, creates an absurdity in petitioner being incar-
4. cerated beyond his actual total period of confinement fixing a par-
5. ole date. (Calif. Code Regs, tit. 15, § 2411, see Church of the Holy
6. Trinity v. United States, 1892 U.S. LEXIS 2036 at p. 2; United
7. States v. American Trucking Assn., Inc., 1940 U.S. LEXIS 1049
8. at p. 20)

9. 13. The BPH's failure to establish petitioner's constitutionally pre-
10. scribed base term at his initial parole suitability hearing or
11. at any of the following hearings under Cal. Code Regs, tit. 15, §
12. 2267 violates his Fourteenth Amendment right to due process
13. and his Sixth Amendment right to trial by jury a base term
14. Calif. Code Regs, tit. 15, § 2403.

15. 14. Clearly the parole procedures used by the BPH's deprive
16. petitioner the due process of law to a constitutionally prescrib-
17. ed base term set within the jury's determination beyond a
18. reasonable doubt of all facts legally essential to his parole
19. release date. (Calif. Cal. Regs, tit. 15, § 2403 accord In re Rosenkrantz
20. 2005 Cal. LEXIS 570 at p. 113

21. 15. Taken together petitioner has an entitlement to and a vested
22. interest in a base term circumscribed by Calif. Code Regs, tit.
23. 15, § 2403, subds. (a) and (c) based on the jury's determination
24. that petitioner is guilty of every element of the crime with
25. which he was charged, beyond a reason doubt. (See E.g.,
26. In re Winship, 397 U.S. 358, 364, 25 L.Ed 2d 368, 90 S. Ct. 1068.)
27. 16. The question presented, is whether the statutory maximum
28. of life is the maximum the BPH's may impose after addition-

(4)

1. al findings of fact at petitioner's initial parole suitability hear-
2. ing Calif. Code. tr.  ... tit. 15, §§ 2402, 2402, or is the regulations
3. ... ... the maximum the Births may impose with additional
4. findings after denial of petitioner's minimum term. (Calif.
5. Code Regs., tit. 15, § 2403.)
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.

1. Claim-1
2.   Whether the BPH deputy commissioner's failure to consider
3. the California Code of Regulations, Title 15, Div.2, Chapter 3, Article 11,
4. § 2403 (Base Term) violates petitioner's right to a jury trial guaran-
5. tee of the Federal Constitutions Sixth Amendment (U.S.C.A. Const. Amend. 6)
6. as incorporated in the Due Process Clause of the Fourteenth Amen-
7. dment (U.S.C.A. Const. Amend. 14).
8.   On or about May 14, 1986 after a jury trial, petitioner was sen-
9. tenced to a term of 15 years to life Penal Code § 199. After comple-
10. ing 10 years plus good time credits of 5 years petitioner appeared
11. before the Board of Prison Terms (now renamed the Board of
12. Parole Hearings). The Commissioner's found petitioner unsuitable
13. for parole at the judicially imposed minimum term of 15 years bas-
14. ed on the crime and the facts found.
15.   Each time petitioner appeared before the Board, the commissioners
16. refused to establish a base term as provided by the California
17. Code of Regulations, Title 15, Div.3, Article 11, § 2403;
18.         "The base term shall be established solely on the
19.         gravity of the base crime, taking into account all
20.         of the circumstances of that crime" (Id. § 2403.)
21.
22.   The California Supreme Court in Dannenberg pronounce distinctly
23. 2005 Cal. LEXIS 570 at p. 11;
24.         "Once the proper matrix is selected, the Board
25.         must impose the middle term unless it finds
26.         aggravating or mitigating circumstances not
27.         accounted for in the matrix. (Cal. Code Regs., tit.
28.         15, § 2403 (a).)"

(6)

1. On December 6, 2005 petitioner appeared the ... board of Paro-
2. le Hearings [hereinafter BPH's] for his third (3) parole suitability
3. hearing after serving twenty six (26) years of a 15 to life sentence.
4. Petitioner was once again denied a base term, that portion of the
5. total period of confinement which reflects the seriousness of the base
6. crime. The commissioner's denied parole based on the circum-
7. stances that petitioner ..."would pose an unreasonable risk of
8. danger to society or threat to public safety if released from
9. prison. Certain facts in petitioner's commitment offence was
10. once again considered to deny the base term (See Lodgment 1, p.46)
11.
12. Petitioner contends that the Board of Parole Hearings [hereinafter
13. BPH's] commissioner's failure to establish a base term as re-
14. quired by the California Code of Regulations, Title 15, Div. 2, Article
15. 11, § 2167, abdicates or violates petitioner's right to jury trial
16. guarantee of the federal Constitution. Sixth Amendment.
17.
18. Does the rule of Apprendi and Blakely apply to the following:
19.   The Board of Parole Hearings, acts in a quasi-judicial man-
20. ner at the initial parole hearing in compliance ..."with the
21. sentencing rules that the Judicial Council may issue". (Penal Code §
22. 3041(a), see Calif. Code Regs., Tit. 15, § 2401.)
23.   The commissioners shall first determine whether petitioner is
24. suitable for release on parole. (Calif. Code Regs., Tit. 15, § 2402.)
25.   Applying a preponderance of the evidence Calif. Code Regs., Tit. 15 §
26. 2000 (50)"good cause", considers parole of petitioners minimum
27. eligible parole release date. (Penal Code § § 3041, 3041.)
28.   At the initial parole hearing, does the BPH's consider the mini-

(7)

1 mum term as found by the jury, elements plead and proven beyond
2 reasonable doubt. If the BPH finds more than the minimum
3 necessary to sustain the verdict or finding as found by the
4 jury Penal Code sections 190, 1168, subd. (b), the BPH has
5 discretion to defer parole of the minimum eligible parole
6 release date. (Penal Code § 3041 (b), In re RosenKrantz 2002 Cal.
7 LEXIS 8317.)

8    Does reliance on the crime after the initial parole suitability
9 hearing Penal Code section 3041 et seq. applying the California
10 Code of Regulations, Title 15, sections 2401, 2403 violate petition-
11 ers Sixth Amendment right to a vested, base term found in
12 Calif. Code Regs., tit. 15, § 2403 ?

13    On December 6, 2005, petitioner appeared before the BPH
14 for his third (3) parole suitability hearing after serving
15 twenty six (26) years of a 15 to life sentence. Petitioner was
16 once again denied a release date based on the circumstances
17 that he ... "would pose an unreasonable risk of danger
18 to society or threat to public safety if released from prison."
19 Certain facts of the commitment offense and the nature of
20 petitioner's crime were also noted as well ... (See Lodgment
21 1 at p. 46.)

22    Did the BPH arbitrarily deny petitioner a base term in
23 violation of his Sixth and Fourteenth Amendment.

24    In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 234, 147
25 L.Ed. 2d 425 (2000), the Supreme Court held that the Due
26 Process Clause of the Fifth and Fourteenth and the Sixth
27 Sixth Amendment jury trial guarantee required that any fact
28 which increases the penalty for a crime beyond the

1  prescribed statutory minimum must be submitted to a jury and
2  be proven beyond a reasonable doubt. Just four years later in
3  Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed. 2d
4  403 (2004) the Court explained that the statutory maximum as,
5  envisioned by Apprendi, is the maximum sentence a judge
6  may impose solely on facts reflected in the jury verdict or
7  admitted by a defendant.

8   Just six months later in the case of In re Dannenberg, 2005
9  Cal. LEXIS 570 at p.11, the California Supreme Court held that
10 "the matrix specifies lower, middle and upper 'base terms'
11 for each matrix category. For second degree murderers, ser-
12 ving statutory sentences of 15 years to life, these 'base ter-
13 ms' range from 15,16 or 17 years for the least serious matrix
14 category to 19, 20 or 21 years for the most serious."

15  Just what is the maximum allowable period of confinement
16 under the California Determinate Sentencing Law, which as-
17 signs a sentencing range of low term, middle term and up-
18 per term to crimes? Both, the California Rules of Court
19 section 4.420 (b) and the California Code of Regulations, Title
20 15, section 2405, subdivision (a) mandate that the Sentencing
21 Court and the BPH's cannot impose an upper term with-
22 out finding factors in aggravation. In other words, may
23 the BPH's impose a sentence of life absent some judi-
24 cial factfinding to justify the sentence?

25  Since Apprendi and Blakely prohibit a court from engaging
26 in factfinding to impose a sentence higher than what it
27 could render without a specific finding by a jury or an
28 admission by a defendant, would the same rule apply

1  to also limit the BPH's in selecting the middle base
2  term as the maximum allowable, without a specific find-
3  ing by a jury or admission by petitioner?

4     Here, Petitioner is not contending that the Apprendi-Blakely
5  rule applies to which of the 3 terms to select, or even
6  which of the various triads of terms within the matrix
7  applies to the case. Instead, it is Petitioner's contention
8  that the BPH's cannot make findings regarding the crime
9  to **altogether take it out of the prescribed matrix** which
10 applies based on the facts already determined by a jury.

11    Does the imposition of a life term sentence by the Board,
12 applying a preponderance of the evidence based or quasi-
13 judicial finding or factors in aggravation, violate Apprendi,
14 and Blakely?

15    The Board's obligations have been set up in a way that is
16 identical to a court's sentencing obligations in determinate cases.
17 In addition to being supported by the California Supreme
18 Court's direct ruling on this point in Roberts, as discussed,
19 found in Hogan, this cross, carry over logically from
20 how the BPH's functions are defined via the relevant
21 statutory and regulatory criteria. (In re Roberts, 2005 Cal.
22 LEXIS 7962, In re Hogan, 1986 Cal. App. LEXIS 2501.)

23    "The Board's determination is based upon the same criteria
24 which governs determinate sentencing, including the need to
25 provided within terms for offenses of similar magnitude
26 and gravity, the number of victims of the crime, and other
27 factors in mitigation or aggravation of the crime. (Penal Code
28 § 3041, subd. (a).)". (In re Hogan 1986 Cal. App. LEXIS 2501

(10)

1  at p. 5.)
2  Is the relevant statutory minimum, the maximum the
3  BPH's may impose onto. Both minto and the minimum
4  necessary to sustain the conviction or is the regulations
5  maximum section 3403(c) the maximum the BPH's may im-
6  pose based on elements plead and proven at trial? (Calif.
7  Pen. Code, § 3040...)
8  The regulations applies specifically to noncapital murder-
9  ers like petitioner who committed his crime on or after
10  November 8, 1978. (Calif. Code Regs, tit. 15 § 2403 et seq.)
11  Does the regulations complying with the Judicial Council's
12  sentencing rules circumscribe the BPH's role in estab-
13  lishing a base term constrained at its outer limits by
14  facts alleged in the indictment and found by the jury ver-
15  dict? (Calif. Cor. Regs, 3403-2.)
16  Does the Regulations clearly mandate imposition of the
17  middle term unless the BPH's makes additional findings in
18  aggravation or mitigation? (Calif. Code Regs, § 2403, see
19  In re Dannenberg, 2005 Cal. LEXIS 576 at p. 11.)
20  Does the Cunningham Rule apply to the BPH's in
21  setting a middle base term within the matrix at the BPH's
22  parole suitability hearing, after consideration of the
23  minimum term Penal Code § 1907?
24  Does the BPH have a clear, present and minister-
25  ial duty to comply with the requirements of the Judicial
26  Council's sentencing rules? (Penal Code § 3041(a).)
27  At all times relevant herein the BPH's has had and
28  continues to have a duty to comply with the Judicial

(1)

1  Council's sentencing rules (Cal. Penal Code, tit. 15, Article II
2     Notwithstanding the duty to establish a base term and
3  ability to do so, the BPH's has failed, refused and continues
4  to fail in performing their duty as required by law. (Cal.
5  Penal Code, tit. 15, § 2403.)
6     In doing so the BPH's failure has denied petitioner
7  his Sixth and Fourteenth Amendment rights in violation
8  of the federal Constitution. (See Apprendi v. New Jersey
9  530 U.S. 466, 490, Blakely v. Washington, 542 U.S. 296,
10  and Cunningham v. California, 2007 U.S. LEXIS 1324.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(12)

## Claim 2

Whether the Board of Parole Hearings Commissioner's failure to establish the base term violates petitioner's right to a liberty interest guarantee of the federal Constitution's Fifth Amendment (U.S.C.A. Const. Amend. 5) as incorporated in the Due Process Clause of the Fourteenth Amendment (U.S.C.A. Const. Amend. 14).

Petitioner contends that the Board of Parole Hearings commissioners failure to establish a base term as required by California Code of Regulations, Title 15, Div. 2, Article 11, § 2403 violates his right to a liberty interest guarantee of the Fifth Amendment.

Petitioner has a legitimate claim of entitlement the BPH's should recognize as being lawful and settled according to the California Code of Regulations, Title 15, § 2403, which petitioner cannot be deprived of by arbitrary or capricious means. (Board of Regents v. Roth, 1972 U.S. LEXIS 131.)

Petitioner contends, initial parole suitability hearing in August , 1988, the Board of Parole Terms (now renamed Board of Parole Hearings) considered whether petitioner was suitable for release of his judicially imposed minimum term. (Penal Code § 190 (a), (1988).) The BPT applied its discretion base on the jury's verdict of the elements pled and proven at trial beyond a reasonable doubt. (Calif. Code Regs, tit. 15, § 2402, see general In re Rosenkrantz, 2002 Cal. LEXIS 8317.)

Before this Court will recognize a constitutionally protected liberty interest, state law must direct that a given action will be taken or avoided only on the existence or nonexistence of

specified substantive predicates. (See Olim v. Wakinekona, 461 U.S.
238, 249, 75 L.Ed. 2d 813, 103 S.Ct. 1741 (1983); Hewitt v. Helms,
459 U.S. 460, 470-72, 74 L.Ed. 2d 675, 103 S.Ct. 864 (1983);
Greenholtz v. Inmates of the Nebraska Penal and Correct-
ional Complex, 422 U.S. 1, 11-12, 60 L.Ed. 2d 688, 99 S.Ct. 2100
(1979).

Petitioner contends that, section 2403 of Title, 15, California
Code of Regulations, creates a liberty interest, that vested, at
his initial parole consideration hearing. The state based on the
petitioner as an individual in the crime of which he was senten-
ce established an entitlement to a constitutionally prescribed
base term. (Calif. Code Regs, tit. 15, §§ 2401, 2403.)

Section 2403 of the California Code of Regulations, Title 15, specifies
in pertinent parts:

> "The base term shall be established solely on
> the gravity of the base crime taking into ac-
> count all of the circumstances of that crime".
> "The base term shall be established by utiliz-
> ing the appropriate matrix of base terms pro-
> vided in this section". And "...the panel shall
> imposed the middle base term".

Section 2403 therefore, constitutes a procedural guideline that
channels the decision-making of the commissioners in estab-
lishing a base term compelling claim to procedural safe-
guards. (Wolff v. McDonnell, 1974 U.S. LEXIS 91 at p. 3.)
The relevant regulations maximum the B.P.H's may impose
has been articulated by the California Supreme Court:

(14)

1  "Once the proper matrix category is selected,
2  the Board must impose the middle term unless it
3  finds aggravating or mitigating circumstances
4  not accounted for in the matrix. (Cal. Code Regs,
5  tit. 15 § 2403 (c).)"
6  (See In re Dannenberg, 2005 Cal. LEXIS 570 at p.11.)
7
8  Petitioner contends, the BPH's violated his liberty interest in a
9  constitutionally prescribed base term which is a fundamental
10  right complete and consummated, and of such character that
11  it cannot be divested without a hearing governed by the pro-
12  cedures mandated in Wolff v. Donnell, 1974 U.S. LEXIS 91.
13  Prior to petitioners initial parole suitability hearing, he was in
14  constructive possession of a minimum 15 year term with a
15  potential life term, as found by a jury verdict, reduced
16  with good time credits. (In re Jeanice (1980) 165 Cal. Rptr. 455,
17  457-58, 22 Cal. 3d. 2106)
18  Petitioner contends, the BPH's considers parole of the minimum
19  term 15 years based on the jury's finding of facts regardless
20  of the time served. That would grant the BPH's total discretion
21  to the minimum term petitioner has served plus enhancements
22  prior to his initial parole suitability. (Calif. Code Regs., tit. 15 §
23  2402 see general, In re RosenKrantz, 2002 Cal. LEXIS 8317.)
24  Section 2402, et seq., merely creates a possibility of discretion-
25  ary parole release to a minimum term Penal Code § 190; it does not
26  create a constitutionally protected liberty interest. (See Green-
27  holtz v. Inmates of the Nebraska Penal and Correctional Complex
28  442 U.S. 1, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979). Therefore

1  section 2402, does not create a liberty interest in parole release
2  from confinement at anytime before expiration of a valid sen-
3  tence.

4  Just what is a valid sentence with respect to persons sentenced
5  to indeterminate terms?

6  "The purpose of punishment is satisfied by the requirement
7  of service of a minimum period before eligibility for parole".
8  (In re Worrall, 2002 Cal. App. LEXIS 4672 at p.11, see also
9  People v. Jefferson, 1999 Cal. LEXIS 4851 at p.14.)

10  This conclusion, however, does not address the question of
11  whether California Code Regulations, Title 15, Section 2402 creates an
12  entitlement to a liberty interest in a base term set after
13  denial of discretionary parole, of a minimum term. (Penal Code
14  §190, applying Calif. Code Regs., tit. 15, §§ 2268, 2402.)

15  The BPHs is the only authority authorized to set the duration of
16  the term. Under Penal Code section 3041, subd. (a), one year prior
17  to petitioner's minimum eligible parole release date, the BPHs
18  either sets the release date or because of public safety considera-
19  tions subdivision (b) of 3041 defers setting the 15 year minimum
20  term Penal Code section 190.

21  Whereas here, the sentencing court imposed a minimum term,
22  did the BPHs have two options at petitioner's initial parole suit-
23  ability hearing?

24  First, the BPHs could have in the exercise of its discretion, up-
25  hold the judicially-imposed minimum term 15 years Penal Code
26  section 190. In this case petitioner's release date would have
27  been at the end of the minimum term 15 years August, 1989,
28  with good time credits. (Pen. Code §§ 190, 2931.)

The BPH's second option was to defer the minimum term, Calif. Reg., § 2402 and establish a base term in the matrix Calif. Reg., § 2403 ..."the base term shall be established solely on the gravity of the base crime" and ..."by utilizing the appropriate matrix of base terms provided in this section." "The panel shall impose the middle base term reflected in the matrix". (Calif Code Regs, tit. 15, § 2403(a).)

Petitioner's contention, the BPH's application of Calif. Code. Regs, tit. 15, Article 11, et seq, has been unconstitutionally applied in the exploitation of Calif. Regs., § 2402 a discretionary paroling authority that creates an irrational and unreasonable result that is inconsistent with what is discribed with "substantive predicates" and "explicitly mandatory language" (Calif. Code Regs, § 2403). Section 2403 standing alone, therefore, constitute a procedural guideline that channels the decision-making of the BPH's. (See hewitt v. Helms, 459 U.S. at 471.

However, section 2411 Calif. Code Regs., tit. 15 provides that "the terms established for the base crime and any adjustments shall be added together resulting in a total period of confinement. (Id., § 2411.)

Those substantive predicates are contained in section 2403 and include standards for petitioners base term as an individual in his crime. (See also Pen. Code § 3041, (b).)

The BPH's application of the California Code of Regulations, Title 15, Div. 2, Article 11, et seq. has lead to an absurd results that is plainly at variance with the policy of the legislation as a whole. (Chruch of the Holy Trinity v. United States, 143 U.S. 457; United States v. American Trucking

(17)

1  Assn, Inc., [illegible]
2  [illegible]
3  In the circumstances of this case, the BPH's continued re-
4  liance upon the nature of petitioner's crime to deny parole
5  in December, 2005, violates the due process of law. First
6  continued reliance upon the unchanging facts of petitioners
7  crime makes a sham of California's parole system and
8  an curts to an arbitrary denial of petitioner's liberty
9  interest. (Briggs v. Terhune, 334 F.3d 910.)
10  Second, in this case, the circumstances of petitioner's
11  crime do not amount to some evidence supportive the con-
12  clusion, that petitioner currently poses an unreasonable
13  risk of danger or relevant.
14  Third the remaining reasons used to deny parole on
15  December 6, 2005, cannot be found in establishing a
16  base term plus adjustments for the fixing of a par-
17  ole release, violating the due process of law. (See
18  Calif. Code Regs., Tit. 15 §§ 2403-2411.)
19  The same reasons use at petitioner's first and se-
20  cond parole hearings where again used in December,
21  2005 to deny parole.
22  Because there was no reliable evidence supporting
23  the BPH's conclusion that petitioner was unsuitable for
24  parole, the Superior Court determination violates the due
25  process of law under the state and federal Fourteenth
26  Amendment (U.S.C.A. Const. Amend. 14)
27  The state courts determination to the contrary, was based upon
28  an unreasonable determination of the facts in light of the

(18)

1  evidence presented during the parole hearing and amount-
2  ed to an unreasonable application of clearly established
3  Supreme Court precedent. (Apprendi v. New Jersey, 530 U.S.
4  466; Blakely v. Washington, 542 U.S. 296; Cunningham v. Calif-
5  ornia, 2007 U.S. LEXIS 1324; Superindentent v. Hill, 472
6  U.S. 445; Giles v. McDonald, 1979 U.S. LEXIS 91.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )     CDC Number C-16564
)
CORNELL WILDER )     INMATE
)
_____)     COPY

CALIFORNIA MEN'S COLONY

SAN LUIS OBISPO, CALIFORNIA

DECEMBER 6, 2005

PANEL PRESENT:

Mr. Stephen LEE, Presiding Commissioner
Mr. Orlando MEJIA, Deputy Commissioner

OTHERS PRESENT:

Mr. Cornell Wilder, Inmate
Mr. Michael Beckner, Attorney for Inmate
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | No | See Review of Hearing |
|---|---|---|
| | Yes | Transcript Memorandum |

**Deborah A. Doane, Peters Shorthand Reporting**

ii

INDEX

PAGE

Proceedings ........................................ 1

Pre-Commitment Factors ............................. 3

Case Factors ....................................... 9

Post-Commitment Factors ........................... 20

Parole Plans ...................................... 30

Closing Statements ................................ 36

Recess ............................................ 44

Decision .......................................... 45

Adjournment ....................................... 52

Transcriber Certification ......................... 53

--oOo--

1

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER LEE:** Mr. Cornell

3     Wilder, CDC Number C-16564, location is CMC

4     East, the date of hearing is December 6, 2005.

5     The inmate was received on May 14, 1980 out of

6     the County of Alameda in Case No. 69342, the

7     offense was murder in the second degree pursuant

8     to Penal Code Section 187.  The term was set at

9     15 years to life, minimum eligibility for parole

10    September 11, 1989.  At this time, we will make

11    our appearances.  My name is Stephen Lee, L-E-E,

12    Commissioner Presiding.

13         **DEPUTY COMMISSIONER MEJIA:** My name is

14    Orlando Mejia, M-E-J-I-A, Deputy Commissioner.

15         **ATTORNEY BECKNER:** Michael Beckner,

16    Attorney for Mr. Wilder.

17         **INMATE WILDER:** Inmate Wilder.

18         **PRESIDING COMMISSIONER LEE:** Your CDC

19    number, sir?

20         **INMATE WILDER:** C-16564.

21         **PRESIDING COMMISSIONER LEE:** We have an

22    officer here for security purposes as well.

23         **DEPUTY COMMISSIONER MEJIA:** Commissioner,

24    we have (inaudible) tape, but this back up is

25    working.

26         **PRESIDING COMMISSIONER LEE:** We'll check

27    it on occasion.  If there is a problem, then

2

1   obviously we will deal with it. Counsel, I have

2   a document, it is marked as Exhibit 1 as well as

3   Exhibit 2.  It appears that Exhibit 1 is a

4   check-off list, do you have documents listed in

5   Exhibit 1?

6       **ATTORNEY BECKNER:** Yes, I do.

7       **PRESIDING COMMISSIONER LEE:** Now in

8   regards to Exhibit 2, there appears to be a

9   signature on it.  Is this the inmate and your

10  signature?

11      **ATTORNEY BECKNER:** Yes.

12      **PRESIDING COMMISSIONER LEE:** Did you go

13  over with the inmate his inmate rights, the

14  hearing procedures, as well as the ADA

15  information?

16      **ATTORNEY BECKNER:** Yes, the inmate has

17  been briefed, and he is aware of his rights.  He

18  knows the procedures very well.

19      **PRESIDING COMMISSIONER LEE:** In regards to

20  the ADA, does the inmate have any accomodations

21  that need to be provided to him?

22      **ATTORNEY BECKNER:** No.

23      **PRESIDING COMMISSIONER LEE:** You do not

24  know of any disabilities that he has that would

25  interfere with this hearing?

26      **ATTORNEY BECKNER:** No.

27      **PRESIDING COMMISSIONER A**ll right.  Sir,

1   at this point in time, do you want me to go
2   through the ADA, the hearing procedures, or the
3   inmate rights, or would you wish for me to go
4   into your case?

5        **INMATE WILDER:** You can go into the
6        case (inaudible).

7        **PRESIDING COMMISSIONER LEE:** Let's get
8   into the inmate's case at this time.  Sir, you
9   have the right to be heard by an impartial
10  panel.  Do you have any objections to myself and
11  to Mr. Mejia?

12       **INMATE WILDER:** No, sir.

13       **PRESIDING COMMISSIONER LEE:** Thank you.
14  The inmate was born on December 6, 1948 in
15  Oakland, California, raised by both parents in
16  Oakland.  He was the oldest of six children
17  (inaudible) marriage of Isaac and Beulah Wilder.
18  It appears that the parents had an older child
19  by a previous relationship.  His father was a
20  molder who died August of 1973 of a heart
21  attack. At the time of the inmate's arrest, the
22  inmate's mother lived in Clear Lake, California,
23  where she owned a restaurant of some kind.

24       The inmate received average grades,
25  attending school to the 11th grade, and his
26  family appears to be normal.  He grew up in a
27  nice area.  All of his brothers and sisters were

4

1   employed and apparently hard working people.

2        The inmate married Brenda, T-R-E-G-L-E,

3   in 1968 and they were separated a year later.

4   At the time of the arrest, the inmate was

5   legally married, but had been separated for

6   eleven years.  During the separation, he had two

7   common law relationships.  One was Joyce Young

8   with whom he had a son, and the second

9   relationship was with Shirley Bolden, who is the

10  victim of this case.

11       Sir, now before I go any further, I know

12  you had a situation with your brother, how did

13  that (inaudible).

14       **INMATE WILDER:** (Inaudible) July 14.

15       **PRESIDING COMMISSIONER LEE:** The date that

16  we were having the hearing?

17       **INMATE WILDER:** Yes, I think we had the

18  meeting on the 13th, he passed the following

19  morning (inaudible).

20       **PRESIDING COMMISSIONER LEE:** You are the

21  oldest, so he must have been a younger brother

22  then?

23       **INMATE WILDER:** (Inaudible).

24       **PRESIDING COMMISSIONER LEE:** I know that

25  has nothing to do with your parole, but I was

26  just wondering how - are you okay with that?

27       **INMATE WILDER:** I am doing the best I can,

5

1   Mr. Lee.

2   **PRESIDING COMMISSIONER LEE:** Were you
3   close with your brother?

4   **INMATE WILDER:** Yes, we were close.

5   **PRESIDING COMMISSIONER LEE:** I forgot, he
6   was sick, wasn't it?

7   **INMATE WILDER:** Yes, he died of cancer.

8   **PRESIDING COMMISSIONER LEE:** Are you in
9   contact with the rest of your siblings?

10   **INMATE WILDER:** Yes, (inaudible).

11   **PRESIDING COMMISSIONER LEE:** Does your
12   mother still have a restaurant?

13   **INMATE WILDER:** No, sir, she is retired
14   now.

15   **PRESIDING COMMISSIONER LEE:** I am curious,
16   what kind of restaurant, a bed and breakfast
17   kind of thing?

18   **INMATE WILDER:** It was a - I have pictures
19   of it (inaudible).

20   **PRESIDING COMMISSIONER LEE:** The inmate
21   has no military history.  The inmate indicated
22   he used marijuana occasionally between 1970 and
23   1980.  He said he used cocaine a few times in
24   1978, started drinking alcohol between 1973 and
25   1980, but said his drinking increased in 1973
26   after his father died.  When your father died,
27   how old were you?

1       **INMATE WILDER:** I was 23 years old.

2       **PRESIDING COMMISSIONER LEE:** How much were

3   you drinking at that time?

4       **INMATE WILDER:** I would say at least one

5   or two six packs of beer (inaudible).

6       **PRESIDING COMMISSIONER LEE:** Apparently

7   your wife said you changed at that point when

8   you started drinking more.  In what way did you

9   change?

10      **INMATE WILDER:** When my father passed it

11  was hard.

12      **PRESIDING COMMISSIONER LEE:** Were you

13  close to your father?

14      **INMATE WILDER:** Yes, very close, and I

15  didn't know how to deal with that.  To be

16  honest, I have never gotten (inaudible) to that.

17      **PRESIDING COMMISSIONER LEE:** Is it because

18  you were younger or because of the way he died?

19      **INMATE WILDER:** Partially the way he died,

20  it was unexpected.  My dad was more like my best

21  friend (inaudible). I could confide in him,

22  (inaudible). We found out even more after he

23  passed away, that he had been sick for two

24  years, and he never told us.

25      **PRESIDING COMMISSIONER LEE:** He knew about

26  it, but he didn't tell you guys about it?

27      **INMATE WILDER:** Yes, we discovered it

1   through letters he had in the files.  He had a
2   file cabinet, and he kept the letters to himself
3   (inaudible).  That didn't help.  We come from a
4   family that we are all very close, we are still
5   close.  I don't understand how you can tell my
6   sister (inaudible), we still talk about it.
7   They still go out and visit the gravesite, but
8   we never believed – even after all this time
9   (inaudible).

10       **PRESIDING COMMISSIONER LEE:** It is cliché,
11  but usually the older child and the younger
12  child are the closest, I guess you being the
13  older child, you spent the most time with your
14  father?

15       **INMATE WILDER:** Yes.

16       **PRESIDING COMMISSIONER LEE:** I am sorry to
17  hear that. It is difficult to think that our
18  parents are mortal, that I know for a fact.

19       **INMATE WILDER:** Yes.

20       **PRESIDING COMMISSIONER LEE:** How was your
21  relationship with your mother?

22       **INMATE WILDER:** No different. She is like
23  my best friend.  We talk a lot.

24       **PRESIDING COMMISSIONER LEE:** She comes to
25  visit you obviously?

26       **INMATE WILDER:** She did – she loves to
27  come to visit. She can't stand to come and see

8

1   me out here, she likes the privacy to be able to
2   sit and talk. She wants to come up, but now
3   being her age because she is 85, I was telling
4   her right now we will just talk on the phone.
5   She has to travel close to 400 miles to get
6   here?

7           **PRESIDING COMMISSIONER LEE:** Where is she?
8           **INMATE WILDER:** She is still living in
9   Clear Lake. We are trying to talk her into
10  moving out of Clear Lake now -

11          **PRESIDING COMMISSIONER LEE:** You and your
12  family?

13          **INMATE WILDER:** My sisters.

14          **PRESIDING COMMISSIONER LEE:** It is good to
15  have family. It is one of the few things that
16  you hold on to. You are a lifer, you know all
17  of these guys in here, they are not talking
18  about their homies or their wives any more, they
19  are talking about family right?

20          **INMATE WILDER:** That's true.

21          **PRESIDING COMMISSIONER LEE:** All right,
22  the inmate's prior convictions. He has no
23  juvenile arrests. The inmate apparently had a
24  burglary in 1967, which was from a vehicle. In
25  1968 he had what appears to be joy riding. In
26  1970, he had possession of marijuana. In 1970,
27  again, he had 60 days - okay, I see. The 11

9

1   through 530 which is old, old section, and they
2   gave him one-year probation for possession of
3   marijuana.  It was changed to 11 through 57,
4   which, again, he was convicted of in 1975 and
5   was given (indiscernible) again. Actually, sir,
6   you don't have very much a conviction of
7   anything.  The only thing you actually have is
8   stealing a car in '68.

9        Then we get into the facts of the case.
10  This is being taken from the Board report.  Per
11  the POR of April 15, 1980, Wilder and Shirley
12  Bolden had previously lived together from March
13  1977 to July 1979.  Sometime after their break
14  up, the victim obtained a restraining order.  On
15  August 24, 1979 during the early morning, the
16  inmate approached the victim in the driveway of
17  her home in Oakland, California.

18       The reports indicate that you approached
19  her as she was entering her car and plus to talk
20  to her.  She threw up her hands and you took
21  them and put them down by her side.  After a
22  brief struggle, Wilder strangled Ms. Bolden with
23  his hands.  The POR is not clear as to the
24  sequence, or at some time, the inmate tied two
25  ropes around Ms. Bolden's neck and one rope
26  around her wrist.  He then drove her car with
27  her body in the trunk to the lot of the Coliseum

10

1   Bart Station.

2       Wilder walked over to 84th street and
3   borrowed a car from his aunt. At 1:30, the
4   inmate transferred her body to the trunk of his
5   aunt's car and drove Shirley Bolden's car to the
6   Emeryville Marina leaving her car in the parking
7   lot.

8       He took BART back to the Coliseum Station
9   where he got into his aunt's car and continued
10  driving. At some point in time, he bought a
11  shovel. The inmate proceeded to Stockton where
12  he spent the night at his brother's home. The
13  next morning he drove to an asparagus field, dug
14  a grave, and buried the victim.

15      At this point in time, Mr. Wilder, I've
16  gone over your juvenile convictions, your drug
17  convictions, your social history, as well as the
18  facts of the crime. Is there anything at this
19  point in time, sir, that you would like to
20  clarify, or did I misstate anything in the
21  record?

22      **INMATE WILDER**: (Inaudible), it is pretty
23  much correct.

24      **PRESIDING COMMISSIONER LEE**: All right.
25  Now, let's talk about this. Obviously you had
26  feelings for this woman, why did you break up?
27      **INMATE WILDER**: To me, it was my stupidity

1  is the only way I can put it.

2      **PRESIDING COMMISSIONER LEE:** Well, it is

3  usually what women say about us.  Okay, go

4  ahead.  So, what did you do?

5      **INMATE WILDER:** It started - you know

6  (inaudible).  I was an individual that really

7  didn't show feelings very much. I know Shirley

8  and I would get up in the morning, she would

9  always maybe give me a kiss or "I love you", so

10  I would say, yes, I love you too (inaudible),

11  not realizing this is something that should

12  (inaudible). I was stubborn, I would say, she

13  knew me, why say it (inaudible). Later on her

14  birthday was coming up in June, and this was off

15  and on (inaudible).  She says, okay,

16  baby,(inaudible). Being my background, also,

17  (inaudible) because I was also doing (inaudible)

18  at the time. She comes home, (inaudible), there

19  was no relationships there, but I didn't realize

20  she was really jealous (inaudible).  So, her

21  birthday was coming up in June of '79, I decided

22  myself and a friend of mine were going to

23  surprise her to Reno.  He has a camper.  He

24  said, (inaudible), and he said well I can go up

25  with you too, and I said okay. So, I asked

26  Shirley's sister to contact me and (inaudible),

27  and I said don't say anything to Shirley, that

12

1   is what I am trying to do.  So, instead, she did
2   say something to Shirley.  I came home one
3   evening and Shirley says to me, you guys, I know
4   (inaudible) next to the telephone.  Again, I
5   said okay and kept walking.  I think that was
6   two weeks after I came home, I (inaudible)
7   truck, I (inaudible) Camero, I had a '61 Camero.
8   I pulled up and I was taking the chains off the
9   truck, and there was two cars (inaudible) police
10  coming down the street.  So, I just kind of
11  looked up and (inaudible).  They come down, they
12  were so loud, and they asked me, they said, Mr.
13  Wilder, you are wanted for carrying a gun, do
14  you have one on you.  I said, no.  He said there
15  has been a restraining order issued, you can't
16  enter your home.  I said restraining order, and
17  he said, yes.  I assumed from the conversation
18  to the best of my recollection, he had been in
19  the house because he said you have a nice home.
20  I looked at him and I just said thank you.  So,
21  he asked me if there was anything you want out
22  of the house.  I said, the way I have two guns,
23  can you bring them out.  He said, okay. I said
24  will you ask - clearly I want to take them down
25  to my mother's house and leave them at my
26  mother's house (inaudible) -

27          **PRESIDING COMMISSIONER LEE:** Hold on.  You

13

1   are telling me that you didn't even have a fight
2   with her and somehow there was a restraining
3   order put out against you?

4       **INMATE WILDER:** There was a problem, but
5   never a restraining order, (inaudible) find out
6   later.

7       **PRESIDING COMMISSIONER LEE:** The police
8   officers thought so.  They apparently helped you
9   get your things out of the house.

10      **INMATE WILDER:** I seen that was true, and
11  they told me there was a restraining order
12  issued, and I didn't realize until going to
13  trial.  My attorney, Mr. (Indiscernible) asked
14  him.  He said, Cornell, I thought you said there
15  was a restraining order issued against you, and
16  I said there was.  I said my cousin was standing
17  there when the policeman said it.  So, he was
18  looking and says (inaudible), and I said what's
19  that, and he said there wasn't one issued.

20      **PRESIDING COMMISSIONER LEE:** You go and
21  you don't - obviously, you try to contact your
22  girlfriend to find out what that was all about I
23  assume?

24      **INMATE WILDER:** Yes.

25      **PRESIDING COMMISSIONER LEE:** What did she
26  tell you.

27      **INMATE WILDER:** We didn't really talk

14

1   because being upset, me personally, I was upset.
2   So, it was a few days and we tried to talk, and
3   I asked a friend of mine, Rodney, a guy I knew,
4   can you set up a meeting, I would like to talk
5   to her.

6        **PRESIDING COMMISSIONER LEE:** I wish you
7   had done it by phone, but anyway, okay.

8        **INMATE WILDER:** Yes, I do too in
9   hindsight.  It was my impatience and stupidity,
10  that is the only way I can put it, not thinking
11  rationally how to deal with the situation of me
12  and her.

13       **PRESIDING COMMISSIONER LEE:** Let me get
14  this straight now, I don't want to misquote you.
15  You think everything is going okay, and then all
16  of the sudden you come home one day, and you
17  find out that the police are there saying that
18  you can't go home.

19       **INMATE WILDER:** I can't enter the house.

20       **PRESIDING COMMISSIONER LEE:** Yeah, and
21  then you don't talk to her, and you have no
22  idea, at least up until this point in time why
23  this is occurring?

24       **INMATE WILDER:** No.

25       **PRESIDING COMMISSIONER LEE:** Interesting,
26  all right.  So, then you go up to talk to her
27  that morning obviously?

15

1       **INMATE WILDER:** Yes.

2       **PRESIDING COMMISSIONER LEE:** I am assuming

3  you ask her what is going on?

4       **INMATE WILDER:** I asked her, I said, hey

5  baby, I want to talk to you.  So, she threw her

6  hands up and I put her hands down at her side

7  and hold my hands on her shoulders.  She just

8  took a deep breath, and she (inaudible).

9       **PRESIDING COMMISSIONER LEE:** Okay, I'm not

10  going to go into the physical part right now.

11  Obviously, you will have an opportunity to talk

12  about that, but I am more concerned about

13  doesn't she tell you that she is tired of you

14  hitting her or tired of you ignoring her, or

15  tired of something, leaving your socks on the

16  ground, something?

17       **INMATE WILDER:** I'm pretty sure in

18  hindsight that phone number that day – we didn't

19  talk after that.  I came home off that phone

20  number, she didn't say anything to me, there was

21  no conversations.

22       **PRESIDING COMMISSIONER LEE:** You are

23  saying something about the telephone number is

24  the reason why she was made at you.

25       **INMATE WILDER:** I'm assuming that she

26  thought that somebody that I wanted to see or I

27  was trying to see.

16

1     **PRESIDING COMMISSIONER LEE:** You never did
2  find out?

3       **INMATE WILDER:** No.

4     **PRESIDING COMMISSIONER LEE:** Obviously, it
5  was a bad situation. She puts her arms up, you
6  put them down, and then what happens?

7       **INMATE WILDER:** She takes one breath, and
8  she passes out. From there, Mr. Lee, I'm going
9  to just refer to the (inaudible) to the previous
10  statements that have been made concerning the
11  offense.

12     **PRESIDING COMMISSIONER LEE:** Basically,
13  you are saying you did not intend to kill her.

14       **INMATE WILDER:** Mr. Lee, for me to say
15  that now, I would have a problem with because
16  not realizing my state of mind that morning of
17  being upset. If I was to say, I think I would
18  have to say I couldn't honestly answer that and
19  say I didn't mean to because of being upset.

20     **PRESIDING COMMISSIONER LEE:** You are
21  saying that you probably mean to?

22       **INMATE WILDER:** Yes.

23     **PRESIDING COMMISSIONER LEE:** How about
24  alcohol or drugs, you were apparently smoking
25  marijuana, you indicated that you had been
26  drinking in the past, did you have anything to
27  drink, to smoke, or any type of drugs that

17

1    morning or the night before?

2         **INMATE WILDER:** After the crime from the

3    police reports also had it (inaudible) after the

4    crime, I stopped at a liquor store on

5    (inaudible).

6         **PRESIDING COMMISSIONER LEE:** That's after,

7    I am asking about before?

8         **INMATE WILDER:** No.

9         **PRESIDING COMMISSIONER LEE:** No?

10        **INMATE WILDER:** No, I did not.

11        **PRESIDING COMMISSIONER LEE:** How do you

12   feel about this, you killed somebody that you

13   cared about, you've been down quite a few years?

14        **INMATE WILDER:** Mr. Lee and Gentlemen, I

15   think about this every single minute. I miss

16   Shirley. Do I think I will get over the things

17   (inaudible), no. I can't. (Inaudible). She was

18   a daughter, a mother, and a sister. I allowed

19   my emotions to get the best of me, and I think

20   about that, not only what I did that morning to

21   hurt her but to other people, as well as her

22   daughter, her family, my family. There were

23   many people hurt by a stupid act. There was no

24   reason for it if I had taken my time to think

25   about it and figure out how to approach it

26   without trying to say, well, this is what I want

27   to (inaudible). There is no one to blame except

18

1  me, and it took me awhile because you always try
2  (inaudible), you always try to put blame on
3  other people. For awhile, I tried to act like
4  it was the (inaudible). (Inaudible), why, I've
5  never considered it (inaudible), and those
6  things that happened prior to that, and all I
7  had to do was acknowledge it and just like the
8  number also, tell her what (inaudible), quit
9  trying to be - I guess the proper term would be
10  not showing your emotions. That was one of my
11  biggest mistakes, never showing emotion. It is
12  sad to say I've had to get older to realize and
13  see (inaudible) to be able to relate to my own
14  emotions. I don't how to correct this, there is
15  nothing I can do except try to be the individual
16  now that I should have been then. I do accept
17  responsibility for my stupidity. It hurts, I
18  prefer to be by myself. There were going to be
19  periods of mental problems that I had over the
20  years as I was trying to deal with my act
21  because I didn't know how to deal with it, it
22  was hard. It is still hard. Shirley was - I had
23  a relationship with ladies, but I never had a
24  relationship and the feelings I had like I had
25  with Shirley. We were like two (inaudible).
26  She was my best friend, my confidant, I liked to
27  sit down and talk to her. My brother

19

1   (inaudible) we were pretty close, and she even
2   (inaudible) worked it out and he would sit and
3   talk with her at times (inaudible). My brother
4   and I started going from the 9th grade
5   (inaudible). To have a lady that she can become
6   your best friend, I thought I knew, but I didn't
7   because I didn't confide in her with the issues
8   of the emotions, my emotions and my feelings.
9   You come to think that you know someone you
10  know, and that is what I discovered because I
11  didn't really know myself (inaudible).

12      **PRESIDING COMMISSIONER LEE:** Are you
13  different now?

14      **INMATE WILDER:** Mr. Lee -

15      **PRESIDING COMMISSIONER LEE:** You seem
16  different.

17      **INMATE WILDER:** Quite a bit different,
18  age. It took time - it's like I could just come
19  in and my first parole hearing and tell people,
20  okay, this is what I see, I couldn't do that. I
21  have to know (inaudible) are here. That is what
22  I feel. I'm not (inaudible). If I have to do
23  this time, I have to do this time. (Inaudible),
24  not what I feel. Now I can tell you what I feel
25  and what I see, and what I have to live with
26  every day because she was a human being and she
27  was my wife (inaudible).

20

1       **PRESIDING COMMISSIONER LEE:** At this time,
2   rather than going over things twice, the Deputy
3   Commissioner will discuss with your programming,
4   assuming you have done programming as well as
5   self-help and your psychological.

6       **DEPUTY COMMISSIONER MEJIA:** institution
7   since your last parole hearing.  Your last Board
8   appearance was on May 21, 2001.  You received a
9   four-year denial.  And the recommendations were
10  for you to remain disciplinary free, upgrade
11  vocationally and educationally, participate in
12  self-help and therapy.  Custody level is medium
13  A, classification score is 19.  (Inaudible) PIA
14  (inaudible) –

15      **INMATE WILDER:** (Inaudible) since January.
16      **DEPUTY COMMISSIONER MEJIA:** Yes.  How long
17  have you been a (inaudible)?

18      **INMATE WILDER:** It was two years ago –
19  this month is two years ago.

20      **DEPUTY COMMISSIONER MEJIA:** So you're
21  still in PIA?

22      **INMATE WILDER:** Yes, sir.

23      **DEPUTY COMMISSIONER MEJIA:** It wasn't in
24  my file (inaudible). What do you do in the PIA
25  (inaudible)?

26      **INMATE WILDER:** I do (indiscernible) and
27  repair.

21

1    **DEPUTY COMMISSIONER MEJIA**: Of what?

2    **INMATE WILDER**: Different kinds of

3    equipment, (inaudible).

4    **DEPUTY COMMISSIONER MEJIA**: (Inaudible)

5    PIA (Inaudible).

6    **INMATE WILDER**: (Inaudible) and prepare it

7    if necessary.

8    **DEPUTY COMMISSIONER MEJIA**: And

9    (inaudible) -

10    **PRESIDING COMMISSIONER LEE**: (Inaudible)

11    self-help and study for problems that I can see.

12    That's not good - a sole reason that you are

13    doing it is simply because you choose not to do

14    it and I hope that later on when you get the

15    opportunity it to speak that you can address

16    that.  Commissioner, I'm sorry.

17    **DEPUTY COMMISSIONER MEJIA**: And, vocation.

18    Did you complete any vocations?

19    **INMATE WILDER**: (Inaudible).

20    **DEPUTY COMMISSIONER MEJIA**: What skill do

21    you get from working for the PIA?  (Inaudible).

22    **INMATE WILDER**: Yes, sir.

23    **DEPUTY COMMISSIONER MEJIA**: I have here

24    (inaudible) 2002, juvenile status (inaudible)

25    PIA (inaudible).  It's noted here

26    (indiscernible) extra (indiscernible) enhance

27    his credibility (inaudible).  "Mr. Wilder has

22

1   demonstrated an (indiscernible) self-help and

2   motivation (inaudible) and outstanding

3   (inaudible).  Wilder (inaudible) operating and

4   maintaining status of machinery and support

5   equipment.  (Inaudible) leather press

6   (inaudible).  Wilder is to be commended for his

7   efforts (inaudible)."  So you work for the

8   machinaries in (inaudible) printing?

9        **INMATE WILDER:** Yes.

10       **DEPUTY COMMISSIONER MEJIA:** (Inaudible).

11  **INMATE WILDER:** I have a background in auto

12  mechanics.  I've been trained (inaudible).

13       **DEPUTY COMMISSIONER MEJIA:** Have you

14  (inaudible)?

15       **ATTORNEY BECKNER:** (Inaudible) job offer

16  (inaudible).

17       **DEPUTY COMMISSIONER MEJIA:** Your self-

18  help.  I know at the time of your therapy you

19  did not acknowledge that you have substance

20  abuse or alcohol problems (inaudible).

21  (Inaudible)?

22       **INMATE WILDER:** No.

23       **DEPUTY COMMISSIONER MEJIA:** (Inaudible)

24  substance abuse?

25       **INMATE WILDER:** No, sir.  I have been

26  (inaudible) twenty-five years of my own

27  choosing, not that it is not accessible in the

23

1  institution. I choose not to indulge.

2      **DEPUTY COMMISSIONER MEJIA:** (Inaudible) in

3  1986 (inaudible), page number - the second to

4  the last page. 1986 (inaudible).

5      **PRESIDING COMMISSIONER LEE:** Dr. Allison?

6      **DEPUTY COMMISSIONER MEIJA:** Third

7  paragraph, second to last page.  You

8  (inaudible)in Dr.(inaudible)that he came to

9  agree with the decision that he was an alcoholic

10  and no longer an addict and he said had led this

11  depression. I did not happen to go into this

12  area, but there is no reason (inaudible)

13  appearing from the records that are agreeable.

14  If you already (inaudible) was anything in

15  alcohol (inaudible) from 1973 (inaudible)

16  starting after (inaudible).  The question I have

17  here is the reason I am asking here is I don't

18  see any much - I don't see any AA or any

19  substance abuse participation when it comes to

20  self-help.  I see you have some one on one type

21  therapy in the 80's, but you have not attended

22  any kind of substance abuse, so you still need a

23  (inaudible) -

24      **INMATE WILDER:** Yes, sir.  I've also taken

25  random drug tests during my incarceration -

26      **DEPUTY COMMISSIONER MEIJA:** I read that.

27      **INMATE WILDER:** -- and if I was using, I

24

1  would just sit here and tell you to your face
2  that I do not choose to use, I have not used.
3      **DEPUTY COMMISSIONER MEIJA:** What other
4  self-help groups have you attended. I'm going to
5  tell you - I'm going to put on record your most
6  recent.  What self-help groups did you attend
7  that would help you deal with those issues when
8  it comes to insight -
9      **INMATE WILDER:** I think starting with one
10 of the groups that I have attended lately was
11 ABP.
12     **DEPUTY COMMISSIONER MEIJA:** That was in
13 2002?
14     **INMATE WILDER:** Yes.  I've taken also
15 (inaudible) after that -
16     **DEPUTY COMMISSIONER MEIJA:** Angry
17 Management and (inaudible) -
18     **INMATE WILDER:** Yes.
19     **DEPUTY COMMISSIONER MEIJA:** That was in
20 2004?
21     **INMATE WILDER:** Yes.
22     **ATTORNEY BECKNER:** You took Life Skills
23 three times, 2003, 2003, and 2004.
24     **DEPUTY COMMISSIONER MEIJA:** (Inaudible),
25 there is a gap between your therapy in the 80's
26 and 2002. What -
27     **ATTORNEY BECKNER:** He took an anger

25

1    control group in June of 1992.

2         **INMATE WILDER:** Let me ask you a question,

3    what groups are available for lifers, unless you

4    are (inaudible)C, sir, you don't receive groups.

5         **DEPUTY COMMISSIONER MEIJA:** (Inaudible),

6    I'm asking you a question, okay?  I am asking

7    you a question as to (inaudible) other than

8    1992, those are (inaudible) as to anger

9    management, substance abuse, it is almost like

10   there is a gap.  What have you been doing?  Have

11   you read books?

12        **INMATE WILDER:** Yes, I do a lot of

13   reading, I just read.

14        **DEPUTY COMMISSIONER MEIJA:** Like what?

15        **INMATE WILDER:** A few of the books I've

16   read, and I still read them are 14 Lessons in

17   Philosophy the Advanced Course, (Inaudible)

18   Christianity, science, and (inaudible), which is

19   a new philosophy, the Secret Doctrines and the

20   Mystical Life of Jesus (Inaudible), the

21   (Inaudible) Gospel of Jesus the Christ, the Lost

22   Books of the Bible, the Forgotten Books of Eden,

23   and presently studying the (Inaudible).

24        **DEPUTY COMMISSIONER MEIJA:** When did you

25   read those books, what period of time?

26        **INMATE WILDER:** Starting from the late

27   80's up until the present.

26

1       **DEPUTY COMMISSIONER MEIJA:** What did you
2   learn from those books?

3       **INMATE WILDER:** I developed a deep
4   religious background, and I was able to now
5   understand and get in touch with my own failings
6   and to realize more than just to see what life
7   has to offer on the surface because I had to
8   realize who I was as an individual.  Until I
9   could accept and understand that, I think that
10  was probably the problems I had on the street
11  because I couldn't recognize and accept and
12  understand –

13      **DEPUTY COMMISSIONER MEIJA:** What is the
14  most recent book that you read about self-help
15  between 2001 and (inaudible)?

16      **INMATE WILDER:** My biggest studies have
17  been the Aquarium Gospel of Jesus the Christ and
18  the (Inaudible) books (Inaudible).  The
19  (Inaudible) Book is a religious book.

20      **DEPUTY COMMISSIONER MEIJA:** Anything else
21  you want to add to your self-help?

22      **INMATE WILDER:** Not that I can think of.
23      **DEPUTY COMMISSIONER MEIJA:** According to
24  (inaudible) 2002, personal growth seminar in
25  2003 and another one in 2003, anger management
26  and lasts to 2004.  The last apparently
27  mentioned two years prior to that, correct?

27

1    **INMATE WILDER:** 115, had one 115 1984 for
2    obeying order, (inaudible) 120 days for the
3    same – (inaudible) on the same day.  So, this I
4    will leave in documentation in here, so the most
5    serious is the 115 (inaudible), and they double
6    back and give (inaudible).

7    **ATTORNEY BECKNER:** The 115 was reduced to
8    administrative.

9    **DEPUTY COMMISSIONER MEIJA:** It is still a
10   115.

11   **ATTORNEY BECKNER:** Yes.

12   **DEPUTY COMMISSIONER MEIJA:** The thing I am
13   trying to say is the 120 A is the same – it was
14   the same (inaudible) –

15   **INMATE WILDER:** Yes, sir.

16   **DEPUTY COMMISSIONER MEIJA:** I would count
17   the 115 and then 120 A, so that would be one
18   incident of misbehavior as far as incarceration.
19   Validated no (inaudible).  The date of the psych
20   report –

21   **ATTORNEY BECKNER:** Commissioner, before
22   you get into the psych report, do you have the
23   chrono's dated May 10, 2005 and October 17,
24   2005?

25   **DEPUTY COMMISSIONER MEIJA:** (Inaudible).

26   **ATTORNEY BECKNER:** One is a critical
27   worker, and this one explains exactly why he was

28

1   moved into maintenance because his expertise in
2   a wide variety of areas.

3       **DEPUTY COMMISSIONER MEIJA:** I know that he
4   is a pretty good worker, and I would review his
5   file (inaudible).

6       **ATTORNEY BECKNER:** Okay.

7       **DEPUTY COMMISSIONER MEIJA:** (Inaudible)
8   There is (inaudible)—

9       **ATTORNEY BECKNER:** (Inaudible).

10      **DEPUTY COMMISSIONER MEIJA:** I understand
11  that. (Inaudible) 1996, however, just like I
12  said, this is 2001 to 2005, and I appreciate
13  your (inaudible). (Inaudible) piece on
14  institutional expense and safety handling of the
15  prison (inaudible), different machineries,
16  buildings, also capable of lighting (inaudible)
17  electrical systems, (inaudible), hydraulics,
18  (inaudible), and cleaning asbestos. (Inaudible)
19  15 years specializing in (inaudible).   In
20  addition to (inaudible) the experience level
21  (inaudible) the complexities of (inaudible) very
22  high allocation level performance (inaudible).
23  So, he is a good worker (inaudible), and he has
24  skills that he can use out on the street,
25  marketable skills.   (Inaudible) –

26      **ATTORNEY BECKNER:** You just asked earlier
27  why he was transferred from printing to

1   maintenance.  I'm not sure his answer was
2   complete enough –

3       **DEPUTY COMMISSIONER MEIJA:** I was confused
4   about what the Board Report said, he said
5   (inaudible), in fact, you acknowledge that.

6       **ATTORNEY BECKNER:** It was actually a
7   promotion.

8       **INMATE WILDER:** (Inaudible).

9       **DEPUTY COMMISSIONER MEIJA:** On the record,
10  (inaudible).

11      **DEPUTY COMMISSIONER MEIJA:** Anything else?
12  I just want to give you an opportunity
13  (inaudible) before I make my brief presentation.

14      **ATTORNEY BECKNER:** I'm sorry, my last
15  Deputy Commissioner liked me to do it category
16  by category, so I will wait till the end.

17      **DEPUTY COMMISSIONER MEIJA:** This is a
18  matter of (inaudible).  Dr. (Inaudible)
19  Psychologist conducted a hearing June 27, 2005,
20  and he established current mental status in the
21  case that Mr. Wilder has recently ended and also
22  has no (inaudible),his client's mood as good and
23  denied any symptoms of depression. He has a
24  history of (inaudible) and denied any current
25  thoughts of harming himself or others. His – the
26  risk for violence assessment has indicated
27  (inaudible) that the outcome of the (inaudible)

30

1    level of (inaudible) are significantly below the
2    average male offender.  (Inaudible) will also
3    support interpersonal and effective in social
4    deviance, and (inaudible) satisfactory score was
5    below that of the average male offender.
6    (Inaudible) below and of the moderate range,
7    while the score on the ACR-20 was on the low
8    range.  These results suggest (inaudible) is in
9    the low range.  The same report also indicates
10   that - strike that. Is there anything else you
11   want to add, counsel, with regards to the
12   presentation - self-help, psych reports,
13   disciplinary, anything you'd like clarified or
14   (inaudible)?

15        **ATTORNEY BECKNER:** Just that he received a
16   couple laudatories.  They were a long time ago
17   of course.  (Inaudible) project in participation
18   in research study and those were back in 1992.

19        **DEPUTY COMMISSIONER MEJIA:** Okay.
20   (Inaudible).

21        **PRESIDING COMMISSIONER LEE:** Let's go into
22   the inmate's parole plans.  The inmate, if given
23   an opportunity of parole - wait a second here,
24   would like to live in Stockton, California.  He
25   has an offer of residence from his brother
26   Sydney Wilder.  In addition, he also has an
27   offer of residence from his sister, Barbara

31

 1    Higgins, who also lives in Stockton, California.
 2         **ATTORNEY BECKNER:** Commissioner, Sydney
 3    Wilder is the brother who died.
 4         **PRESIDING COMMISSIONER LEE:** Then you
 5    still have Barbara Higgins?
 6         **ATTORNEY BECKNER:** Right, that's the
 7    primary one.
 8         **PRESIDING COMMISSIONE LEE:** In Stockton,
 9    California?
10         **ATTORNEY BECKNER:** Yes.
11         **PRESIDING COMMISSIONER LEE:** Wilder says
12    he has a firm job offer in a mechanical
13    maintenance position at Norton Corporation, Inc.
14    Stockton.  Is that still available?
15         **INMATE WILDER:** No, sir.
16         **PRESIDING COMMISSIONER LEE:** Because of
17    your brother?
18         **INMATE WILDER:** Yes.
19         **PRESIDING COMMISSIONER LEE:** We do not -
20         **ATTORNEY BECKNER:** Hold on for one second.
21    (Inaudible).
22         **INMATE WILDER:** Yes, and also my sister-
23    in-law there was a (inaudible) job that she
24    could inquire doing janitorial to help me.
25         **PRESIDING COMMISSIONER LEE:** As long as
26    you have a job offer, you are going to have to -
27    if you are unfortunate enough to have to come

32

1   back again, then you are going to have to get
2   those letters into us, okay?

3       **INMATE WILDER:** (Inaudible). (Inaudible),
4   it is kind of hard to get the job offers.
5   (Inaudible).

6       **PRESIDING COMMISSIONER LEE:** You probably
7   shouldn't have just it for the next (inaudible),
8   you should have probably put a little more time,
9   but hindsight is 20/20 obviously.  Anyway, at
10  this point in time, I do have some letters.
11  Pursuant to 3042, there are notices that sent
12  out by various or two organizations that have a
13  special interest in your case.  We do have a
14  response.  We do have a response first of all
15  dated September 27, 2005 from the City of
16  Oakland, J. Amery, A-m-e-r-y, Lieutenant with
17  the police Homicide. The inmate is coming before
18  the Board Parole Hearing. On August 25,1979,
19  Shirley Bolden was reported missing on September
20  17, 1979. (Inaudible) were made with the inmate,
21  he was found untruthful on a lie detector during
22  the interview (inaudible) strangling the victim.
23  To (inaudible) and the lack of respect to human
24  life exhibited by the inmate, we urge the Board
25  not to (inaudible).  Obviously, it says
26  something a little bit more different, but I
27  don't really want to go into that.  The other

1    letter is from Alameda County, the District

2    Attorney's Office, it goes to the facts of the

3    case through various things he has done, and

4    basically indicates –

5    **ATTORNEY BECKNER:** I'm going to object to

6    a paragraph in this letter.

7    **PRESIDING COMMISSIONER LEE:** Which

8    paragraph are you referring to?

9    **ATTORNEY BECKNER:** It is Roman Numeral Two

10   Behavior List for violence, the second page.

11   Actually, the whole – those first two paragraphs

12   of the whole section, it is all hearsay about

13   (inaudible) with his intimate female partners.

14   While I understand allowing these letters with

15   regard to the life crime itself because those

16   facts are deemed admitted by the Board, anything

17   that has to do with the facts that are alleged

18   facts that are not in the record, my client has

19   not ability to confront them.  It violates his

20   Sixth Amendment rights to confrontation because

21   he can't cross examine this District Attorney,

22   and we can't cross examine everyone that he is

23   talking about.  So, I would ask that the entire

24   section of Roman Numeral Two, Behavioral History

25   of Violence, be stricken and not considered by

26   the Board.

27   **PRESIDING COMMISSIONER LEE:** Your

34

1   objection is noted.  For all of the reasons
2   above, and this is the recommendation section.
3   On behalf of the Alameda County District
4   Attorney's Office, the people of the County of
5   Alameda and the State of California
6   (indiscernible) inmate parole at this time.  The
7   inmate remains in dangerous denial about his
8   conduct and responsibility for the loss of his
9   ex-lover's life.  I don't think that applies as
10  much now as the inmate has not indicated he was
11  not taking responsibility for the act. I will
12  indicate that there is a letter here from George
13  Flinler, unfortunately September 26, 2005,
14  (indiscernible) attorney and he basically
15  indicates that the inmate is suitable for
16  parole.  Is there anything else, Counsel, at
17  this time, that you would like to bring forth?
18      **ATTORNEY BECKNER:** There is a letter that
19  I received late last night, a support letter.
20      **PRESIDING COMMISSIONER LEE:** All right,
21  and this is from Clifford Jeffrey, J-e-f-f-r-e-
22  y.  I have known the inmate for 38 years. His
23  family supports him.  The inmate has spent the
24  majority of his adult life in prison. I have
25  stated before that Cornell has a great family
26  support besides me.  Who is Clifford Jeffrey,
27  sir?

35

1          **INMATE WILDER:** One of my best friends.
2          **PRESIDING COMMISSIONER LEE:** He lives in
3    (Inaudible). If you were to get a date
4    (inaudible) most of your friends are in the
5    Stockton area?
6          **INMATE WILDER:** My friends are Stockton
7    and Tracy and the rest of my family.
8          **PRESIDING COMMISSIONER LEE:** Anything
9    else, Counsel?
10          **ATTORNEY BECKNER:** You were trying to
11    ascertain whether or not you received a couple
12    of letters from his sisters?
13          **PRESIDING COMMISSIONER LEE:** I don't have
14    anything. If I remember correctly, the last time
15    you were here, I had some letters, so I don't
16    think as big of an issue. I think he does have a
17    place to stay in Stockton.  I think the bigger
18    problem was, of course, the job situation.  I
19    don't have any letters.
20          **DEPUTY COMMISSIONER MEIJA:** (Inaudible).
21          **INMATE WILDER:** That's my niece.
22          **DEPUTY COMMISSIONER MEIJA:** Barbara
23    Holmes, sister.
24          **INMATE WILDER:** That's my sister.
25          **DEPUTY COMMISSIONER MEIJA:** Is that the
26    ones you are talking about? (Inaudible). I can
27    read this too.

36

1       **PRESIDING COMMISSIONER LEE:** I have them.
2   They are just basically letters supporting his
3   release as well as giving him a place to stay in
4   Stockton, correct?
5       **ATTORNEY BECKNER:** Did the niece reference
6   the job at all (inaudible)?
7       **PRESIDING COMMISSIONER LEE:** This is
8   Shinece Higgins, correct?
9       **INMATE WILDER:** Yes.
10      **PRESIDING COMMISSIONER LEE:** It wouldn't
11  be appropriate anyway, it is not on letterhead,
12  it is not an actual offer, so the desire is
13  there, but the paperwork is not supportive.
14  Having said that, at this point in time, I think
15  it is appropriate to go to statements.  We do
16  not have a district attorney here, so, Mr.
17  Beckner, you may begin.
18      **ATTORNEY BECKNER:** Thank you. Mr. Wilder
19  has rehabilitated himself in prison.  I believe
20  he has earned a second chance.  I believe he
21  should be found suitable for parole. He has
22  admitted guilt for the life crimes.  He has
23  taken responsibility for the life crimes.  As he
24  has told you today, he has acknowledged fully
25  the lawfulness of his actions, and he is not
26  appeared to minimize or rationalize his role in
27  the offense, and he is genuinely genuinely

37

1    remorseful for his actions.   He appears to have
2    the (indiscernible) the emotional level of the
3    harm done to the victim and the victim's family,
4    the harm done to his soul mate.   The crime was
5    not committed during the commission of another
6    crime. It was not committed in a specially –
7    there were no multiple victims attacked. There
8    are not aggravating facts beyond the minimum
9    elements of the crime.   There is no evidence
10   suggesting that he committed a greater degree of
11   the offense that his conviction evidences.   The
12   crime was the result of some significant stress
13   in his life in that he was distraught when his
14   girlfriend broke up with him.   Mr. Wilder has no
15   juvenile record, and his adult record is
16   minimal. He does not have a record of assaulting
17   others as an adult or committing crimes with the
18   intention of harming the victims.   He has
19   experienced reasonably stable relations with
20   others in the prison.   Prior to his
21   incarceration, he developed skills working as an
22   auto mechanic, an assembly worker, and a
23   machinists helper, and burner.   You've all heard
24   today his excellent work record here in prison.
25   PIA print plants leads to the mechanic and now a
26   maintenance handyman.   He has received almost
27   nothing but exceptional work reports, he has

38

1  been designated a critical worker since 1986.
2  He has been commended for his excellent attitude
3  and working well with supervisors.  He has
4  participated in depression therapy group,
5  rational behavior training. Individual therapy,
6  personal growth seminars, alternative to
7  violence projects, stress management, anger
8  control group, alternatives to violence, a
9  project again.  He has taken this personal
10 growth seminar, life skills.  He has explained
11 to you why he has not taken Alcoholics Anonymous
12 (Indiscernible) Anonymous because of his self
13 discipline, he has not had a drink or done any
14 illegal drugs while in prison, although he has
15 been exposed to them and had the opportunity.
16 It is his own personal self respect and his will
17 that has allowed him not to do that.  He has
18 been an active helper in prison, he assisted
19 with the hunger project, participated in a
20 research study.  As you have seen, he has had an
21 excellent discipline record.
22 Since 1984, no 115's, and no 128's since 1990.
23 At the time of the crime, Mr. Wilder was only 30
24 years old; he is now 56.  At this age, the
25 probability of recitidism is vastly reduced. His
26 parole plans are solid and feasible, residence
27 is assured with his sister, Barbara, but he can

39

1    also live with any of his other sisters in
2    Stockton.  As he has told you, he has a very
3    close family support network consisting of his
4    sisters and their families and his mother and
5    friends that he still has in the Stockton area.
6    While the unfortunate tragedy of his brother's
7    death has eliminated a firm job offer, he has
8    very marketable skills in printing, auto
9    mechanics, and as a handyman that should enable
10   him to readily find employment. In fact, his
11   niece still working at the plant where his
12   brother was able to offer him a job, and she is
13   going to do her best to see that job offer
14   remains.  On May 18, 2001, the Board denied Mr.
15   Wilder four years, and I was honestly
16   incredulous at that because his prior denial was
17   two years, and he had been discipline free in
18   the interim. The request was that he remain
19   discipline free, upgrade vocational education,
20   participate in self-help, and therapy. He has
21   addressed some for the Board's reason
22   (indiscernible) by upgrading vocationally, by,
23   in essence, getting a raise or promotion to a
24   position of multiple responsibility in PIA.  He
25   has taken self-help and therapy and remained
26   discipline free.  The reason he hasn't gotten
27   his GED in his own view, to him, it is a piece

1 of paper. He has educated himself far behind
2 taking a couple of courses in math, science, and
3 English. He reads books on religion and
4 philosophy, he also studies the penal code. He
5 studies the California Code of Regulations; he
6 was quoting it to me this morning. Whereas I
7 personally place a high value on education, I
8 strove to achieve as high educated as I could, I
9 recognize that is not everyone's thing. He has
10 done – his work record has been so stellar and
11 his skills are so stellar; he has focused on
12 that instead. He has seen a psychologist, Dr.
13 Cynthia Glens in her reported dated June 27,
14 2005, rated him as a low risk, and this was
15 based upon the following risk factors: low level
16 of psychopathy, significantly (indiscernible)
17 for a male offender, (indiscernible) low end to
18 moderate. His HCR20 is very low. She didn't cite
19 any high risk factors. Mr. Wilder has honestly
20 admitted his sense of responsibility of his
21 crimes, he demonstrated genuine remorse for his
22 crimes and sincere empathy for the victims, for
23 the victim and her family. As I discussed
24 earlier, the circumstances of a life of crime do
25 not suggest viciousness beyond the minimum
26 elements of second degree murder. As a result,
27 it is going to be difficult for the Board to

1    cite some evidence of aggravated facts beyond
2    the known elements of the crime. If the Board
3    does determine that the crime is aggravated to
4    some extent, under due process principles
5    contained in the Fifth and Fourteenth Amendments
6    to the United States Constitution and federal
7    due process rights to not be altered by a state
8    board, the denial of parole based on the
9    immutable facts of the life crime alone is only
10   allowed if there is other evidence of current
11   dangerousness. That was set forth by the Ninth
12   Circuit in Biggs versus Tehoon in 2003. To hold
13   otherwise would put Mr. Wilder in the impossible
14   situation where no matter what he shows in terms
15   of present rehabilitation, remorse, insight,
16   responsibility, and valid parole plans, he would
17   never be able to overcome the unchanging facts
18   of the life crime. In either case, given the
19   manner in which Mr. Wilder has programmed in
20   prison, given that his psychological evaluator
21   has an opinion that he would pose a low risk of
22   violence if released, given his advanced age,
23   and given that he has satisfactorily addressed
24   some of the Board's reasons for denying him
25   parole at his last hearing, has clearly
26   rehabilitated himself, and is no longer a threat
27   to public safety. Therefore, it is held by the

 1  California Supreme Court in Henry Danonberg, he

 2  must be granted parole, and to hold him any

 3  longer would constitute excessive incarceration

 4  in violation of the Cruel and Unusual Punishment

 5  clause in the California Constitution Article I.

 6  Section 17 and the Eight Amendment to the United

 7  States Constitution.  This is (indiscernible) by

 8  the fact that Mr. Wilder has now served 25 ½

 9  years of 15 to life sentence.  His incarceration

10  extends beyond the Board's matrix for this

11  crime, which is 18, 19, 20 years.  As the

12  California Supreme Court again held in

13  Danonberg, and I am going to quote, "No prisoner

14  can be held for a period grossly

15  disproportionate to his individual copability

16  for the committed offense.  Just excessive

17  confinement violates the Cruel and Unusual

18  Punishment Clause of the California Constitution

19  Article I. Section 17.  Thus, we acknowledge

20  Section 304 when (indiscernible) cannot

21  authorize such as inmate's retention, even for

22  reasons of public safety beyond this

23  constitution maximum period of confinement."  I

24  respectfully submit that the 25 ½ years Mr.

25  Wilder has served places him beyond this

26  constitutional maximum period of confinement.  I

27  believe the evidence demonstrates that Mr.

43

1   Wilder has rehabilitated himself, and he no
2   longer poses a threat to public safety.
3   However, even if the Board disagrees, because of
4   the length of time he has served, he must be
5   granted parole.  To hold him any longer would
6   violate his Eighth Amendment and corresponding
7   California Constitutional rights.  Please let
8   him go.

9       **PRESIDING COMMISSIONER LEE:** Mr. Wilder.
10      **INMATE WILDER:** Gentlemen, first let me
11  say I apologize for not taking AA (inaudible).
12  First off, believe me I do not choose to indulge
13  any type of illegal type of drugs, and I have no
14  interest in alcohol.  Maybe it was a phase of I
15  probably went through and also not being able to
16  deal with the situations at that time. I know
17  individuals that have taken NA and AA and they
18  can come here and tell you they are clean and
19  they are not.  I offer you the truth, I can't
20  offer you anything else, and ask that as to a
21  job, yes, I have an offer that can be made and
22  it would be a firm job offer, but it won't be in
23  janitorial.  I have nothing against the Board,
24  but if I find it becomes a problem with me
25  because I always felt the sufficient of old
26  plans a place to stay was important, therefore,
27  I have financial support as well in place in

44

1  order to obtain a job once released.  I have not

2  found in the regulations, and no disrespect to

3  the panel whatsoever, that requires it.  I don't

4  think having some place to stay again that

5  allows me to obtain that position out there to

6  be able to try to sell yourself by letter is

7  hard, and if I didn't have a place to stay, I

8  would understand.  I know I am capable of going

9  out, obtaining gainful employment, and being a

10  productive part of society.  If you choose to

11  hold it against me, I also understand.  I can

12  tell you this, once you granted parole, whenever

13  and if ever, I will not let the Panel down, and

14  they will be happy that they allowed me that

15  chance to demonstrate that I am a changed man. I

16  am not the individual that was put in prison in

17  1980, and I am not going to sit and try to

18  inflate or sell myself. I only ask you to

19  believe the truth that given the chance, I can

20  demonstrate I will be a productive part of

21  society and live within the laws of society.

22       **PRESIDING COMMISSIONER LEE:** Thank you,

23  Mr. Wilder.  At this point, I am going to

24  recess.  We will deliberate, we will call

25  everyone back once we have made a decision.

26  Thank you very much.

45

1                          **R E C E S S**

2                            --oOo—

1    **CALIFORNIA BOARD OF PAROLE HEARING**

2              **D E C I S I O N**

3        **DEPUTY COMMISSIONER MEJIA:** Back on the

4    record for our decision on Mr. Wilder.

5        **PRESIDING COMMISSIONER LEE:** The Panel has

6    reviewed all information received from the

7    public and in providing the following the

8    circumstances concluding the prisoner is not

9    suitable for parole, and may pose an

10   unreasonable risk of danger to society or a

11   threat to public safety if released from prison.

12   The offense was carried out in a dispassionate

13   and calculated manner, which was carried on in

14   which manages to demonstrate a callous disregard

15   for human suffering.  The motive for the crime

16   was inexplicable and very trivial in

17   relationship to the offense.  The inmate has

18   indicated that he was apparently was in a

19   relationship and for what ever reasons, we do

20   not know, the relationship fell apart.  It was

21   indicated that there was no restraining,

22   however, you did note that there was some type

23   of tension between he and the victim.  He

24   apparently attempted to contact the victim early

25   in the morning when she was going to work, and

26   he strangled her in a manner which obviously

27   **CORNELL WILDER C-16564  DECISION PAGE 1   12/06/05**

47

1  caused her death.  The prisoner has an
2  escalating of criminal conduct.  He has failed
3  to profit from society's previous attempts to
4  correct his criminality, including adult
5  probation in the county jail.  I'm not going to
6  hold the 115 against the inmate, it is too long
7  ago, it is 1984.  Another reason for the denial
8  is lacks realistic parole plans, he does not
9  have residential plans in the last county of
10  legal residence, however, he does have
11  residential plans in Stockton, California.  It
12  would seem that the Board could take that into
13  account if and when he is appropriate for
14  release.  He does not have acceptable employment
15  plans, he does not have any certificates, though
16  he has indicated that he does have some training
17  on mechanics, car mechanics, before coming to
18  prison.  The other reason for the denial, we
19  note the opposition from the District Attorney's
20  Office of Alameda County as well as the Oakland
21  Police Department.  The Panel makes the
22  following findings: The prisoner needs therapy,
23  self-help, and programming in order to face,
24  discuss, understand, help with stress in a non-
25  destructive manner as well get further insight
26  into the crime.  The inmate in the past has not
27  **CORNELL WILDER C-16564  DECISION PAGE 2  12/06/05**

48

1    indicated that he took full responsibility of

2    his actions.  There have been denials in the

3    past and various versions, and the District

4    Attorney's office pointed that out.  The inmate

5    has come to grips with it, but I think there

6    needs to be maintain that for a while.  So,

7    until progress is made, the prisoner continues

8    to be unpredictable and a threat to others.

9    Nonetheless, the prisoner is committed for the

10   following:

11        **DEPUTY COMMISSIONER MEJIA:** He has been a

12   prisoner (inaudible) since 1984 and has

13   performed as a critical worker for the

14   institution.  Since 1992, he has been valuable

15   service (inaudible) for the institution when it

16   comes to his operations and needs of

17   maintenance.

18        **PRESIDING COMMISSIONER LEE:** However,

19   these positive aspects of behavior do not

20   outweigh factors of unsuitability.  In a

21   separate decision, the hearing panel has found

22   the prisoner has been convicted of murder, and

23   it is not reasonable to expect a hearing will be

24   granted in the next three years.  Sir, I am in a

25   very difficult situation, and I will explain to

26   you my difficulty.  My difficulty is this, I

27   **CORNELL WILDER C-16564  DECISION PAGE 3  12/06/05**

49

1  don't agree with your attorney's interpretation
2  of Danonberg and Griggs, but that is neither
3  here nor there, that can be if necessary, that
4  could be written, and the Appellant Court can
5  decide that.  My biggest problem is not the
6  crime itself.  I truly believe, and based upon
7  Danonberg which is the Supreme Court of the
8  State of California, that the offense does or
9  can dictate whether or not an individual is
10 released and that the sentence itself is not 25
11 years, it is not the matrix, it is life.
12 Danonberg clearly indicates that it is part of
13 your sentence, life.  What I have a problem with
14 is that you seem to be a very bright man, you
15 might have had sessions before, this is not the
16 first time you have spoken, but you seem
17 willful.  For me, I make the – I endeavor to
18 make the attempt to look below appearances.  I
19 have found in my life that not a lot of people
20 do.  It is much more easy to do a knee jerk
21 appropriate action.  I'm indicating to you that
22 is what is happening.  You are coming across –
23 no, though, I don't think you are, but you are
24 coming across as I am going to do my own thing.
25 I don't care what the Board says.  You went from
26 two to four the last time because you wouldn't
27 **CORNELL WILDER C-16564  DECISION PAGE 4  12/06/05**

50

1   get your GED, which I think you can do standing
2   on your head.  That is just my opinion, and I
3   think you know that.  The thing is, when you
4   come across like that, then we are in this
5   dilemma.  You have a person who has committed a
6   murder, he has a life sentence, but he won't do
7   what people are asking him to do.  Even in
8   regards to your alcohol, if you had told me,
9   look, you know what, I am going to go to AA even
10  though I don't need it, I am going to go to AA
11  anyway.  That sounds different than when you sit
12  there and say, well, I've chosen not to drink.
13  Why is that different, because basically you can
14  choose not to drink.  I mean you can choose back
15  to drink again.  There is no magic in AA or
16  anything.  If you find another program, fine, go
17  do that program, go read a book on it, I don't
18  care.  The thing is, the AA has a track record,
19  and that is the difference.  The track record,
20  of course, as you know, is probably based on the
21  support situation that other people will kind of
22  hold you accountable and these other things.  I
23  don't know why it works, but it works.  Our
24  problem is that people in prison, there is a
25  revolving door, you see them all the time, and
26  they say, ah, I'm not going to take any drugs,
27  **CORNELL WILDER C-16564  DECISION PAGE 5  12/06/05**

51

1   and they go back out in the street, and they

2   come back.  That is the reason why the Board

3   emphasizes these things.  It is not as though

4   you were in that situation where you never took

5   any drugs and you never took any alcohol.  You

6   did have a problem with these areas.  You have a

7   record.  My opinion is that you come across that

8   way, I don't think necessarily you are that way,

9   but you've got to think about that.  All right?

10  That is just a recommendation.  Do with it what

11  you wish.  The offence was carried and managed

12  with demonstrated sexual and callous disregard

13  for human suffering.  Here was a women who if it

14  wasn't love or maybe still was in love with the

15  inmate at the time that he strangled her, there

16  is no such thing as a quick strangulation.  The

17  motive of the crime was inexplicable and trivial

18  in relationship to the offense.  We are not even

19  sure what went on based upon the inmates'

20  versions, and I will take the benefit of the

21  doubt, that he was never learned what the

22  problem was.  The prisoner has a history of

23  (indiscernible) of unstable relationships with

24  others.  The prisoner has not completed

25  necessary programming, which is essential to his

26  judgement and needs additional time to gain the

27  **CORNELL WILDER C-16564  DECISION PAGE 6 12/06/05**

52

1    programming.  He has failed to participate fully
2    in some kind of substance abuse program or get
3    his GED as recommended by the Board in the past.
4    Therefore, (indiscernible) or evaluation, the
5    prisoner is required before the Board should
6    find the prisoner suitable for parole.  The
7    Board makes the following recommendations:
8    Remain disciplinary free, upgrade vocationally
9    and educationally, and participate in self-help
10   and therapy programming.  Sir, you know these
11   are recommendations, and I can't force you into
12   it, but you may find that the next Board will
13   not drop you a year like I did this year and
14   say, you are not listening to us, and we are
15   going to up you a year.  There are commissioners
16   that will do that, you know that, all right, so
17   it is your choice, you know, good luck.

18         **INMATE WILDER:** Thank you, Commissioners.
19   Thank you for your time.

20         **PRESIDING COMMISSIONER LEE:** Good luck, Mr.
21   Wilder.

22                         --oOo--

23   **PAROLE DENIED THREE YEAR**

24   **THIS DECISION WILL BE FINAL ON:** $\underline{APR - 5\ 2006}$

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**
26   **DATE THE DECISION IS MODIFIED.**

27   **CORNELL WILDER C-16564  DECISION PAGE 7 12/06/05**

53

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, DEBORAH A. DOANE, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 52, and which recording was duly recorded at CALIFORNIA MEN'S COLONY, SAN LUIS OBISPO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF CORNELL WILDER, CDC NO. C-16564, ON DECEMBER 6, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 28, 2005, at Sacramento, California.

DEBORAH A. DOANE
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

Cornell Wilder C-16564
P.O. Box 8103, U-1, D-9, L1 "West"
San Luis Obispo California
93403-8103

Clerk of the United States District Court
for the Northern District of California
450 Golden Gate Avenue, Box 36060
San Francisco, California 94102